# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00797-CR

**Pontrey Jones, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY
## NO. D-1-DC-19-904049, THE HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Pontrey Jones was convicted of murder and sentenced to life imprisonment. *See* Tex. Penal Code §§ 12.32, 19.02. On appeal, Jones argues that the trial court included an incorrect instruction in the jury charge on punishment, that the jury improperly considered information not admitted into evidence, that the trial court erred by failing to hold a hearing on his motion for new trial, and that his trial attorney provided ineffective assistance of counsel. We will affirm the trial court's judgment of conviction.

## BACKGROUND

In 2016, Jones alternated living at the homes of several family members, including his mother, grandmother, and an uncle. After Jones's grandmother asked him to leave her home, Jones began living under a bridge. When Jones's stepmother Magdalena Ruiz learned that Jones was homeless, she invited Jones to live with her, his father Pontrey Simon, their two

young children T.S. and A.S., and her son I.R. from a previous relationship.[1]  Jones had lived with them before when he was younger and moved into their home in October 2016 when he was twenty years old.

On a night in December 2019, the family was watching a football game.  Ruiz and Simon were rooting for opposing teams.  During the game, Jones was helping I.R., A.S., and T.S. get ready for bed.  After Jones returned to the living room, he placed under the couch a knife he had taken from the kitchen.  Later during the evening, Jones grabbed the knife and stabbed Ruiz multiple times.  Simon grabbed Jones and held him against the door.  I.R. heard the commotion and came out of his bedroom.  I.R. saw his mother lying on the couch with her eyes closed and noticed that her chest was bleeding.  I.R. watched his mother inhale deeply two times before dying.  When Simon called 911, Jones ran out of the house.  Police officers responding to the 911 call found Jones in the area naked and yelling incoherently with his clothes scattered on the street.  After placing Jones in handcuffs, the officers transported him to the police station where Detective Daryl Tynes interviewed him.

In the interview, Jones said that he had been diagnosed as bipolar but had stopped taking his medicine when he turned eighteen.  Jones stated that he "was supposed to break his sister's neck when he put the kids to sleep" but felt that he could not go through with that plan.  Further, Jones explained that he grabbed a knife from the kitchen, placed it under the couch, and stabbed Ruiz in the chest multiple times while she was sitting on the couch after she started gloating about the football game.  Jones stated that he stabbed Ruiz to set his father "free."  When Detective Tynes revealed that Ruiz had died from her injuries, Jones responded by saying

---

[1] Because the children are minors, we refer to them by their initials.  *See* Tex. R. App. P. 9.10(a)(3).

that he "was hoping" that would happen and that he was not sorry for stabbing her. During this exchange, Jones also revealed that he believes that women are "demons or witches." After the interview, Jones was arrested and charged with murdering Ruiz.

Prior to trial, Jones was deemed incompetent to stand trial and was committed to a mental-health hospital for treatment. After Jones's competency was restored, a trial commenced. During the guilt-innocence phase, multiple witnesses testified, including Simon, I.R., Detective Tynes, investigating police officers, Ruiz's sister, Ruiz's nephew Brandon Hinkle, and the medical examiner who determined that Ruiz died from internal bleeding caused by multiple stab wounds. Detective Tynes testified that Jones expressed no remorse for his actions. Hinkle stated that while Jones was being treated at the mental-health hospital, Jones apologized to him for killing Ruiz and expressed regret about his actions.

After considering the evidence, the jury found Jones guilty of murdering Ruiz.

During the punishment phase, multiple witnesses testified, including two of Ruiz's sisters, Simon, Jones's mother, Jones's grandmother, Officer Andrea Rios, three correctional officers at the jail housing Jones, Dr. William Lee Carter, and Dr. Marisa Mauro. One of Ruiz's sisters testified that Ruiz tried to be a mother figure for Jones, that I.R. was devastated by his mother's death and could not function after losing her but was doing better at the time of the trial, that T.S. and A.S. miss their mother, and that she is worried that Jones will kill again because he has expressed no remorse for his actions. Ruiz's other sister testified that A.S. said that she wanted to die after Ruiz was killed. Both sisters testified that their family is now incomplete. Simon testified that seeing Jones murder his wife was devastating, that he felt like he had lost everything, and that this loss was the hardest that he had ever experienced. In addition, Simon described Jones as dangerous and having anger issues as a child.

3

One of the officers stationed at the jail testified that Jones "became very disruptive and aggressive," would kick the door while in his cell, and stated that he wanted to hurt himself and other people. Another officer explained that Jones was classified as a high-risk detainee because he attempted to escape and threatened staff and other inmates. A third officer explained that he caught Jones trying to escape by hiding in a recycling bin and that charges were filed against Jones for the attempted escape. Next, Officer Rios testified that Jones would masturbate when she and other female employees were around despite being warned about the behavior.

In his case-in-chief, Jones called his mother and grandmother as witnesses. Jones's mother testified to moving multiple times and leaving him with Simon and Simon's family during one move. Further, Jones's mother stated that he would alternate living with her, his grandmother, and Simon and that in kindergarten he began taking medication for mental-health issues. Additionally, Jones's mother stated that after Jones damaged property at school and started acting out, a juvenile court ordered that he receive treatment at a mental hospital where he remained for months. Further, Jones's mother related that he continued to have outbursts after being released from the hospital, that she asked Simon to let Jones move in with him and Ruiz when Jones had another incident, and that Ruiz cared for Jones as though he was one of her children. Next, Jones's mother testified that he moved back in with her for a while, that he stopped taking his medicine when he turned eighteen because he did not like the way it made him feel, that his behavior then worsened, and that he was charged with aggravated assault for trying to attack her brother with a knife. Moreover, Jones's mother testified that he moved out of her house, started living with other relatives for short periods, and that one relative asked Jones to move out after Jones kicked in a door. Additionally, Jones's mother recalled that Jones

4

became homeless after a relative asked him to move out and that Ruiz located him and brought him to her house.

Jones's grandmother testified that he lived with her for more than four years while he was in elementary school and that she tried to be a stabilizing influence for him. She also explained that he lived with her when he was older but that she had to ask him to leave because her husband had Alzheimer's and would get into arguments with Jones after becoming confused regarding who Jones was.

Both the State and Jones called expert witnesses to discuss his mental health and his potential for future dangerousness. The State's expert, Dr. Carter, diagnosed Jones as suffering from a schizoaffective disorder, bipolar disorder, antisocial-personality disorder, and thought disorder. In addition, Dr. Carter testified that mental-healthcare workers can apply a clinical risk analysis to assess who might be prone to future criminal behavior and that the analysis considers an individual's past and current factors. Regarding the prior factors, Dr. Carter related that Jones had a history of aggression and violence and of using cocaine, marijuana, and synthetic marijuana; had been diagnosed with a major mental illness; lacked empathy for others; had a dysfunctional upbringing; and had the early markings of a personality disorder. Regarding the current factors, Dr. Carter stated that Jones has a current mental-health issue, is impulsive, is not responding to treatment as much as his treating physicians would like, and has acted out in jail. Based on his assessment, Dr. Carter determined that Jones currently poses a "very high" risk of future violence. However, Dr. Carter also explained that Jones was young when he committed the offense, that his brain had not fully matured, and that he could turn his life around and become a functioning member of society if properly medicated.

Finally, Jones's expert, Dr. Mauro, testified regarding her evaluation of and interactions with Jones. Regarding her initial assessment after Jones's arrest, Dr. Mauro related that based on her observations of his behavior, she believed that he was suffering from schizophrenia, which is characterized by disorganized behavior, hallucinations, and delusions. Further, Dr. Mauro testified that after Jones's competency was restored following his treatment at the mental-health hospital, he had a stable mental status and did not display active symptoms of a thought disorder, was no longer responding to hallucinations, and no longer seemed delusional. Additionally, Dr. Mauro explained that she changed her initial diagnosis to an antisocial-personality disorder, a cannabis-use disorder, and an "unspecified schizophrenia spectrum" disorder. Regarding her diagnosis, Dr. Mauro agreed that people with schizophrenia and similar illnesses can lack the ability to empathize with others, be violent, and get worse over time without proper medication. Dr. Mauro stated that Jones admitted that he did not always take his medication and that "he would be at greater risk" of engaging in further violence if not treated. However, Dr. Mauro agreed that most people suffering from a mental illness like schizophrenia are not violent. Dr. Mauro also described one of her interviews with Jones in which he "got agitated with" her after she talked about the offense. In particular, Dr. Mauro testified that she had to terminate the interview because she became concerned for her safety when Jones got angry and that she arranged for the next interview to be held with a physical barrier between Jones and her.

After considering the evidence, the jury sentenced Jones to life imprisonment. Following his conviction, Jones filed a motion for new trial. Over a month later, Jones filed several motions seeking a hearing on the motion for new trial. Jones also filed a motion to recuse the trial judge from considering the motion for new trial. After a hearing on the motion to

6

recuse, the assigned trial judge denied the motion. No hearing was held on the motion for new trial, and the motion was overruled by operation of law.

Jones appeals the trial court's judgment of conviction.

## DISCUSSION

On appeal, Jones contends that there was error in the jury charge on punishment, that the jury improperly considered information that was not properly presented during the punishment hearing, that the trial court erred by failing to convene a hearing on his motion for new trial, and that his trial attorney provided ineffective assistance of counsel during the punishment phase.

**Jury Charge**

In his first issue on appeal, Jones argues that the trial court erred by including an incorrect instruction in the jury charge during punishment. The instruction at issue is governed by subsection 4(a) of article 37.07 of the Code of Criminal Procedure, which mandates the inclusion of the following instructions in murder and other felony cases:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.

7

> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Tex. Code Crim. Proc. art. 37.07, § 4(a).

On appeal, Jones contends that the trial court failed to comply with the statutory directive requiring the inclusion of the instruction set out above and, therefore, failed to comply with its obligation to properly set out the law applicable to the case in its charge. *See id.* art. 36.14. In particular, Jones asserts that the trial court's instruction omitted one of the statutorily required statements by failing to include the language specifying that for individuals sentenced to a term of less than four years, they must serve at least two of those years before becoming eligible for parole. *See id.* art. 37.07, § 4(a). Next, Jones argues that the charge improperly included "good conduct" language that was present in prior versions of subsection 4(a) but was removed by the Legislature in 2019. Specifically, the relevant portion of the jury charge in this case provided as follows:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, *without consideration of any good conduct time he may earn*. Eligibility for parole does not guarantee that parole will be granted.

(Emphasis added). The language above is identical to the language contained in the prior version of subsection 4(a) before the Legislature amended the statute a few months before the trial in this case. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 5.02, sec. 4, 1993 Tex. Gen. Laws 3586, 3744 (amended 2019) (current version at Tex. Code Crim. Proc. art. 37.07, § 4(a)).

The jury charge made only one reference to good-conduct time and did not include the other good-conduct-time instructions from the former version of subsection 4(a)

8

describing how convicted individuals may earn time off their incarceration "through the award of good conduct time," listing examples of what types of activities might result in good-conduct time being accrued and revoked, and stating that the application of good-conduct credit cannot be predicted and that the jury may consider the existence of good-conduct time but may not consider the extent to which good-conduct time might apply to the defendant at issue. *Id.*

In its brief, the State does not dispute that the omission of the example for individuals given a sentence of four years or less and that the inclusion of the language regarding good-conduct time were erroneous, and it acknowledges that the trial court was required to provide the statutory instruction from the current version of subsection 4(a) set out above. We conclude that the failure to include in the charge the language from subsection 4(a) was error. *See Sanders v. State*, 448 S.W.3d 546, 548 (Tex. App.—San Antonio 2014, no pet.) (noting that courts have routinely concluded that language from article 37.07 is mandatory and that trial courts are not authorized to alter instruction from precise statutory language); *see also Abraham v. State*, No. 05-18-00942-CR, 2019 WL 5118858, at *2 (Tex. App.—Dallas Oct. 10, 2019, no pet.) (mem. op., not designated for publication) (concluding that jury charge was erroneous because it "failed to inform the jury that if appellant were sentenced to a term of less than four years he must serve at least two years before he is eligible for parole").

If an appellate court determines that there is error present in a jury charge, it must then evaluate the harm caused by the error. *See Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The amount of harm required to reverse depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If no objection was made, as in this case, a reversal is warranted only if the error "resulted in 'egregious harm.'" *See Neal v. State*, 256 S.W.3d 264,

9

278 (Tex. Crim. App. 2008) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

"Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). "The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm," *Swearingen*, 270 S.W.3d at 813, and "reversal for an unobjected-to erroneous jury instruction is proper only if the error caused actual, egregious harm to" the defendant, *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). "Egregious harm is a difficult standard to prove, and such a determination must be made on a case-by-case basis." *Niles v. State*, 595 S.W.3d 709, 711 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Neither party has the burden of establishing either the presence or a lack of harm. *See Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). Instead, the court makes "its own assessment" when evaluating what effect an error had on the verdict by reviewing the record before it. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000) (quoting Wayne R. LaFave & Jerold H. Israel, Criminal Procedure 1165 (2d ed. 1992)). In assessing harm, reviewing courts "consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).[2]

---

[2] In his reply brief, Jones suggests that the harm analysis set out above is not the appropriate standard by which the harm from the jury-charge errors in this case should be evaluated. Although Jones acknowledges that the harm analysis was set out by the Court of Criminal Appeals in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g), he refers to several cases in which justices have criticized its application, *see, e.g.*, *Gelinas v. State*, 398 S.W.3d 703, 713-14 (Tex. Crim. App. 2013) (Meyers, J., dissenting); *Almanza*, 686 S.W.2d at 179 (Teague, J., dissenting). However, courts evaluating jury-charge errors regarding erroneous parole and good-conduct-time instructions have applied the *Almanza*

On appeal, Jones contends that the erroneous inclusion of the good-conduct instruction harmed him because it deprived him of "the opportunity to be considered for a shorter sentence than life" by confusing the jury and misleading it "to speculate that [he] might be granted clemency earlier than the minimum incarceration period of time dictated by the law." Moreover, Jones asserts that although the charge erroneously mentioned good-conduct time, the charge did not include the instruction from the prior version of the statute directing the jury not to consider how good conduct might be applied in this case. Further, Jones argues that the omission of the four-year example regarding parole increased the possibility that the jury would "not consider a shorter sentence" because the jury was not informed "that the Legislature has carefully considered the impact of the parole law in connection with low-end sentences, even in serious cases." Building on this premise, Jones asserts that the harm from the erroneous instructions is evidenced by the fact that the jury gave him the maximum possible sentence.[3]

---

harm analysis. *See Cormier v. State*, 955 S.W.2d 161, 164 (Tex. App.—Austin 1997, no pet.) (explaining that failure to give mandatory statutory jury charge "is charge error subject to *Almanza* analysis"); *see also Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (applying egregious-harm analysis from *Almanza* to jury-charge error issue involving another portion of article 37.07 and explaining that appellate review of jury-charge errors is governed by *Almanza*). Accordingly, we conclude under the circumstances present here that the *Almanza* harm analysis is the proper standard by which to evaluate any harm accompanying the jury-charge errors.

[3] In this issue, Jones also refers to Rule of Appellate Procedure 21.3, which provides that a defendant "must be granted a new trial, or a new trial on punishment . . . when the court has misdirected the jury about the law or has committed some other material error likely to injure the defendant's rights." Tex. R. App. P. 21.3(b). To the extent that Jones is separately arguing that the jury-charge error present in this case entitles him to a new trial on punishment under Rule 21.3(b), we note that charge-error issues addressed under that Rule still require courts to perform the type of harm analysis set out above. *See State v. Sciacca*, 518 S.W.3d 460, 463-64 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also Igo*, 210 S.W.3d at 647 (explaining that Rule of Appellate Procedure cannot supersede statutory directive of "Article 36.19, as construed in *Almanza*").

11

*Entirety of Jury Charge*

Regarding the first factor, we note that the jury charge made only one reference to good-conduct time. Accordingly, the erroneous inclusion of that instruction was not compounded by any other mention of "good conduct time" in the remainder of the charge. Although Jones contends that the inclusion of the good-conduct instruction might have misled the jury by indicating that he could earn time off his incarceration by accruing good-conduct-time credit, the erroneous instruction was included in the portion of the charge discussing when a defendant may become eligible for parole. Regarding parole eligibility, the remainder of the charge properly informed the jury that it is not possible to predict how parole law might be applied to Jones and that the jury could consider the existence of parole law but not the way it might be applied to Jones. In other words, the jury was instructed not to consider how good-conduct time and parole might apply to Jones. *See Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011) (observing that it is presumed jury followed court's instructions); *Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet.) (noting that "curative instruction" may cure error in instruction pertaining to subsection 4(a)); *see also Luquis v. State*, 72 S.W.3d 355, 360 (Tex. Crim. App. 2002) (noting that purpose of instruction under prior version of article 37.07 was generally to inform jurors of the concepts of good-conduct time and parole and then prohibit jury from using those concepts in its calculus in assessing appropriate punishment).

Similarly, although the jury charge omitted the required instruction setting out when a defendant may become eligible for parole if sentenced to a term of less than four years, it also explained that the minimum punishment authorized in this case was five years. *See* Tex. Penal Code § 12.32. Accordingly, the omitted instruction would not have applied in this case.

12

*See Abraham*, 2019 WL 5118858, at *3 (determining that omission of four-year instruction would only be theoretical and not actual harm in case in which defendant was subject to punishment for first-degree felony); *Gutierrez v. State*, No. 05-16-00638-CR, 2018 WL 258979, at *5 (Tex. App.—Dallas Jan. 2, 2018, pet. ref'd) (mem. op., not designated for publication) (explaining that because minimum sentence in case was twenty-five years, instruction pertaining to individuals sentenced to less than four years "was inapplicable in this case" and overruling issue asserting error in jury charge).

For these reasons, we conclude that the first factor weighs in favor of a determination that Jones was not egregiously harmed by the jury-charge errors.

*Arguments of Counsel*

Turning to the second factor, we note that neither side mentioned parole or good-conduct time during their opening or closing arguments. *See Lopez v. State*, 314 S.W.3d 70, 73 (Tex. App.—Waco 2010, no pet.) (concluding that defendant was not egregiously harmed by erroneous instruction regarding good conduct and parole where "[t]he State did not mention parole or good-conduct time in its closing argument"); *Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd) (determining that defendant was not egregiously harmed by improper instruction concerning parole and good-conduct time and noting that "there were no comments at any point in the trial by either the State or appellant's counsel concerning parole, parole eligibility, good conduct time, or any effect good conduct time might have on eligibility for parole").

Accordingly, we conclude that the second factor does not weigh in favor of a determination that Jones was egregiously harmed.

13

*State of the Evidence*

Regarding the third factor, we note that although the jury assessed the maximum punishment, the evidence presented at trial demonstrated the tragic and egregious nature of the murder and that there was a high probability that Jones would engage in future violent offenses. *See Martinez v. State*, 313 S.W.3d 358, 369 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (noting that defendant was given life sentence but explaining that fact "alone does not indicate egregious harm"); *see also Luquis*, 72 S.W.3d at 367-68 (noting that maximum sentence "is unsurprising given appellant's crime, his cavalier confession, and his abysmal criminal record").

At trial, evidence was presented indicating that Ruiz acted like a second mother to Jones and provided him support and a place to live after he became homeless. Moreover, in his confession to the police, Jones explained that he was planning on killing his younger sister by breaking her neck on the night of the murder but instead decided to stab Ruiz because he believed that Ruiz was mocking his father. Moreover, in his testimony, Detective Tynes explained that when he informed Jones that Ruiz had died, Jones responded by stating that "was good, that he expected her to expire from it," and that he was "hoping" that she would die. This recorded exchange between Jones and Detective Tynes was shown to the jury. In addition, the evidence established that Jones killed Ruiz while her family, including her young children, were in the house and that her son I.R. saw his mother die from her injuries. Moreover, one of Ruiz's sisters explained that I.R. was devasted by his mother's death and could not function right after her death and that Ruiz's other two children missed their mother. Similarly, another sister testified that A.S. initially stated that she wanted to die after losing her mother. Both sisters related that their family was not the same after Ruiz's death. In his testimony, Simon explained

14

that he lost everything when his wife died and that this event has been the hardest thing that he has ever had to go through.

In addition to the evidence regarding Jones's guilt, evidence was also introduced pertaining to his history of aggressive behavior and potential to harm others in the future. First, Jones's mother testified that a juvenile court ordered Jones to go to a treatment center after he acted aggressively and damaged property at his school. She also explained that Jones continued to act aggressively after being released from the treatment center, that he stopped taking his medication when he got older because he did not like the way it made him feel, and that his behavior got worse. Next, she stated that Jones went to live with a relative but that the relative forced Jones to move out after he kicked in the door to the house. Further, she explained that Jones tried to stab her brother, which led to him being arrested and charged with aggravated assault. Simon similarly testified that Jones is dangerous.

Regarding Jones's time in jail, one officer explained that Jones behaved in a "very disruptive and aggressive" manner and stated that he wanted to hurt himself and others. Similarly, another officer related that Jones threatened staff and other detainees. A third officer explained that Jones attempted to escape from jail. Further, Officer Rios explained that Jones would masturbate when she and other female employees were present at the jail and repeated that behavior despite multiple warnings.

The State's expert witness, Dr. Carter, explained that Jones was young when he committed the murder, that his brain had not fully matured, and that he had time to turn things around if he received and accepted help for his mental illness. However, Dr. Carter explained that Jones's risk of future violence was "very high" at the time of the trial. When describing how he made his assessment, Dr. Carter explained that Jones had a dysfunctional upbringing and has

15

a serious mental illness, a history of aggression and violence, a substance-abuse issue, a lack of empathy for others, and trouble controlling his impulses. Dr. Carter testified that Jones has not responded positively to treatment and has acted out while in jail.

In addition, Jones's expert witness, Dr. Mauro, testified that although Jones's condition seemed to improve after he was treated at a mental hospital, he had an "unspecified" schizophrenia disorder, an antisocial-personality disorder, and a substance-use disorder. Further, Dr. Mauro recalled that Jones "got agitated with" her during an interview in which they discussed the offense, that she felt unsafe when he got angry, and that she arranged for them to be separated by a physical barrier during their next interview. Although Dr. Mauro testified that most people with Jones's type of mental illness are not violent, she explained that people suffering from that type of illness can lack the ability to empathize with others, be violent, and get worse. Dr. Mauro stated that Jones admitted that he did not always take his medicine and that if he is not properly treated, he will "be at greater risk most likely of future violence" to others.

In light of this evidence, we conclude that the third factor does not weigh in favor of finding egregious harm.

*Other Factors in the Record*

Turning to the fourth factor, we note that nothing in the remainder of the record indicates that the jury-charge error egregiously harmed Jones. "There is no evidence the jury was confused about the instructions in the charge." *See Shavers*, 985 S.W.2d at 292. For example, "the jury did not send any notes to the trial court regarding" the jury instructions. *See Murrieta*, 578 S.W.3d at 556. Similarly, nothing in the record "suggests that the jurors

16

discussed, considered, or tried to apply . . . what they were told about good conduct time and parole." *See Cardoza v. State*, No. 03-13-00269-CR, 2015 WL 1636688, at *3 (Tex. App.—Austin Apr. 9, 2015, no pet.) (mem. op., not designated for publication).

Accordingly, we conclude that the fourth factor does not weigh in favor of a finding of egregious harm. Given our resolution of the factors discussed above, we conclude that the jury-charge errors did not egregiously harm Jones.

In this issue, Jones also asserts that the trial court's failure to provide the correct instruction under subsection 4(a) violated his due-process rights. However, Jones neither presented this issue to the trial court nor raised it in his motion for new trial. In general, to preserve a complaint for appellate review, "the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion." *See* Tex. R. App. P. 33.1. Even constitutional rights, such as the right to due process, may be waived if the proper request, objection, or motion is not asserted in the trial court. *Curry v. State*, 186 S.W.3d 39, 42 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Even if this argument were preserved, we would not conclude that Jones's due process rights were violated in this case. As support for his due-process claim, Jones refers to *Simmons v. South Carolina*, 512 U.S. 154 (1994). In *Simmons*, the Supreme Court determined in a capital murder case that "where the defendant's future dangerousness is at issue" and where "state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156. In that case, the prosecutor emphasized Simmons's future dangerousness and urged the jury to sentence him to death. *Id.* at 157. Moreover, Simmons was not given the opportunity to inform the jury that a life sentence had no possibility of parole under the governing state law and was denied the opportunity to

17

argue that he would not pose a danger to society because "he never would be released on parole." *Id.* at 165-66. Accordingly, the Supreme Court determined that Simmons's due-process rights were violated because he may have been sentenced to death "on the basis of" the inaccurate and misleading "information which he had no opportunity to deny or explain." *Id.* at 161-62, 171.

We believe *Simmons* is distinguishable. This case, unlike *Simmons*, is not a death-penalty case. That difference is significant because the holding in *Simmons* is an "extension of the Supreme Court's 'death-is-different' mitigating evidence jurisprudence for capital cases." *Jimenez v. State*, 32 S.W.3d 233, 246 (Tex. Crim. App. 2000) (McCormick, P.J., concurring). In effect, *Simmons* "carved out for capital offenses an exception to the general rule that determinations 'as to what a jury should and should not be told about sentencing' are 'purely matters of state law.'" *Id.* (quoting *Simmons*, 512 U.S. at 168). Moreover, although the jury charge in this case did omit the four-year parole example and improperly included the good-conduct instruction as it related to parole, the charge did properly instruct the jury that it could generally consider the existence of parole law but could not consider how parole might be applied to Jones. Furthermore, although the State did emphasize the possibility that Jones might pose a risk in the future and urged the jury to impose the maximum punishment, it did not make those arguments "in the context of a possible sentence reduction resulting from application of the law of parole." *Cf. Lopez v. State*, No. 05-12-01531-CR, 2014 WL 296001, at *5 (Tex. App.—Dallas Jan. 27, 2014, pet. ref'd) (op., not designated for publication). Accordingly, we do not believe that the due-process concerns identified in *Simmons* are present in this case.

For these reasons, we overrule Jones's first issue on appeal.

18

**Hearing on Motion for New Trial**

Because the second and third issues present overlapping claims, we will address the third issue before the second one and then address the remaining issues in order.

In his third issue, Jones contends that the trial court erred by failing to hold a hearing on his motion for new trial. In his motion for new trial, Jones asserted two grounds. First, Jones argued that the trial court's charge did not comply with the requirements of the recent amendments to subsection 4(a) as set out above. Next, Jones argued that the jurors improperly considered evidence that he "'sat up' and 'smiled' at [Officer Rios] who was testifying about alleged misconduct that occurred while [he] was in custody." Approximately a month after Jones filed his motion for new trial, he filed a motion requesting a hearing on his motion for new trial and attached to the motion a juror's affidavit in which the juror described his behavior during Officer Rios's testimony. On appeal, Jones contends that the trial court erred by failing to hold a hearing because his motion raised an issue not determinable from the record and because the juror's affidavit provided "reasonable grounds to believe that the jury considered and discussed matters outside the testimony from the witness stand."

"The purpose of a hearing on a motion for new trial is to: (1) 'decid[e] whether the cause shall be retried' and (2) 'prepare a record for presenting issues on appeal in the event the motion is denied.'" *Smith v. State*, 286 S.W.3d 333, 338 (Tex. Crim. App. 2009) (quoting *State v. Gonzalez*, 855 S.W.2d 692, 695 (Tex. Crim. App. 1993) (plurality op.)). Although the opportunity to prepare a record for review "makes a hearing on a motion for new trial a critical stage, . . . such a hearing is not an absolute right." *Id.*; *see Torres v. State*, 4 S.W.3d 295, 296 (Tex. App.—Houston [1st Dist.] 1999, no pet.). For example, "a hearing is *not* required when the matters raised in the motion for new trial are subject to being determined from the record."

19

*Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993). On the other hand, a trial court may abuse its discretion "by failing to hold a hearing on a motion for new trial that raises matters which are *not* determinable from the record." *Id.* However, even if the defendant raises an issue that is not determinable from the record, a trial court is not obligated to convene a hearing on the motion for new trial unless the defendant "establishes the existence of 'reasonable grounds' showing that the defendant 'could be entitled to relief'" and submits "an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim." *Smith*, 286 S.W.3d at 339 (quoting *Reyes*, 849 S.W.2d at 816).

Appellate courts review a trial court's decision to deny a hearing on a motion for new trial for an abuse of discretion. *Id.* Accordingly, appellate courts reverse "only when the trial judge's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree." *Id.* (quoting *Gonzalez*, 855 S.W.2d at 695 n.4). An appellate court's review of a trial court's denial of a hearing on a motion for new trial "is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable." *Id.* at 340.

After filing a motion for new trial, "[t]he defendant must present the motion for new trial within 10 days of filing it," unless the trial court authorizes a later presentment. Tex. R. App. P. 21.6. A "trial court is not required to hold a hearing on the motion if it has not been timely presented." *Arrellano v. State*, 555 S.W.3d 647, 655 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). "[T]o present a motion in the context of a motion for new trial, the defendant must give the trial court *actual notice* that he timely filed a motion for new trial and requests a hearing on the motion for new trial." *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). "Presentment requires a defendant to do more than simply file the motion for new

trial with the trial court clerk." *Bearnth v. State*, 361 S.W.3d 135, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "Proof of presentment must be apparent from the record" and "may be evidenced by the judge's signature or notation on the proposed order, an entry on the docket sheet indicating presentment or setting a hearing date, or other proof that the trial court was actually aware of defendant's request for a ruling or hearing on the motion." *Arrellano*, 555 S.W.3d at 655. "Presenting the motion, along with a request for a hearing, is required to let the court know that the defendant wants the trial court to act on the motion and whether the defendant would like a hearing on the motion." *Rozell*, 176 S.W.3d at 230. "Thus, a reviewing court does not reach the question of whether a trial court abused its discretion in failing to hold a hearing if no request for a hearing was presented to it." *Id.*

In this case, Jones timely filed a motion for new trial. *See* Tex. R. App. P. 21.4. However, the motion did not ask for a hearing. *See Gallegos v. State*, 76 S.W.3d 224, 228 (Tex. App.—Dallas 2002, pet. ref'd) (explaining that trial court is not required to have hearing on motion for new trial if movant does not request hearing); *see also Carranza v. State*, 960 S.W.2d 76, 78 (Tex. Crim. App. 1998) (explaining that "the filing of a motion for new trial alone is not sufficient to show 'presentment'"); *Funderburke v. State*, No. 03-15-00634-CR, 2017 WL 3897209, at *1-2 (Tex. App.—Austin Aug. 22, 2017, no pet.) (mem. op., not designated for publication) (stating that "the record must contain some evidence indicating that the trial judge or court personnel was actually aware of the appellant's motion and desire for a hearing and not merely evidence of efforts by defense counsel to present the motion to the court").

Moreover, although Jones later filed multiple motions requesting a hearing on his motion for new trial and although the record demonstrates that some of those motions were emailed to the trial court coordinator, *see Butler v. State*, 6 S.W.3d 636, 641 (Tex. App.—

21

Houston [1st Dist.] 1999, pet. ref'd) (observing that presentation to court coordinator can satisfy presentment requirement of giving actual notice to trial court), those motions were filed more than thirty days after he filed his motion for new trial, and nothing in the record demonstrates that the trial court authorized Jones to present the motion beyond the ten-day deadline contained in the Rules of Appellate Procedure, *see* Tex. R. App. P. 21.4 (requiring defendant to file motion for new trial no later than 30 days after date sentence is imposed), .6 (providing that defendant must present motion for new trial within ten days of filing it unless trial court permits it to be presented and heard later). Additionally, the court coordinator did not schedule a hearing after being sent the email. *See Estrella v. State*, 82 S.W.3d 483, 486 (Tex. App.—San Antonio 2002, pet. dism'd) (determining that defendant presented motion for new trial where defendant "presented motion to court coordinator" within ten days of filing motion, "who then filled out the 'case setting form' and set a hearing date"). Further, although one of the motions contained a proposed order, the trial court did not sign or make any notation on the proposed order. *See Gardner v. State*, 306 S.W.3d 274, 305-06 (Tex. Crim. App. 2009) ("Although the motion contains a document titled 'Order for a Setting,' that document does not suffice as a request to hold a hearing on the motion").

In addition, the trial court did not issue an order denying the motion for new trial or the motions requesting a hearing, and the motion for new trial was overruled by operation of law. *See* Tex. R. App. P. 21.8. "Where a motion for new trial is overruled by operation of law, the trial court's failure to conduct a hearing, without more, is simply a 'failure to rule' on the request for a hearing." *Oestrick v. State*, 939 S.W.2d 232, 235 (Tex. App.—Austin 1997, pet. ref'd). For an appellate court to address an issue regarding a trial court's failure to rule, the record must show that the trial court "refused to rule on the request, objection, or motion" and

22

that "the complaining party objected to the refusal." Tex. R. App. P. 33.1. The record in this case does not show that the trial court refused to rule on any request for a hearing or that Jones objected or otherwise complained to the trial court about the refusal.

In any event, even assuming that Jones's issue may be considered on appeal, we would be unable to conclude that the trial court abused its discretion by failing to hold a hearing. As set out above, Jones argued in his first ground in his motion for new trial that the trial court did not include in its jury charge the mandatory language from the recent amendment to subsection 4(a) of article 37.07 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 37.07, § 4(a). A determination regarding whether the required language was included in the charge was determinable from the record, and accordingly, the trial court would not have abused its discretion by failing to hold a hearing on this ground. *See Reyes*, 849 S.W.2d at 816.

In his second ground in his motion for new trial, Jones argued that some of the jurors improperly "received evidence from a source other than the witness stand" because the jurors allegedly saw him sit up and smile at Officer Rios, who testified about how he regularly masturbated in front of her and other female employees. Moreover, Jones submitted an affidavit from one of the jurors who stated that she observed him smiling at Officer Rios during her testimony discussing his behavior at jail, that his "mannerisms were odd," that the juror "was disgusted" by his behavior, that his smiling made it seem like he did not have remorse, that his behavior indicated that he was mentally ill because his emotions were not appropriate, and that the jurors mentioned during their deliberations that they noticed him smiling. However, the juror also specified that Jones's improper display of emotion "didn't influence [her] vote for life."

Generally speaking, "we do not allow the parties or the public to impeach" a jury "verdict with evidence of what occurred between the jurors in the sanctity of th[e] jury

23

deliberation room." *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 209 n.7 (Tex. Crim. App. 2003) (Cochran, J., concurring); *see also Sanders v. State*, 1 S.W.3d 885, 888 (Tex. App.—Austin 1999, no pet.) (explaining that limitation "on juror testimony in post-trial proceedings is intended to encourage open discussion among jurors during deliberations, to promote the finality of judgments, and to protect jurors from harassment by unhappy litigants seeking grounds for a new trial"). *But see Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017) (explaining that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant," "no-impeachment rule" must "give way"). Consistent with that public policy, Rule of Evidence 606 sets out that during an inquiry into the validity of a verdict, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Tex. R. Evid. 606(b). Further, the Rule prohibits a trial court from receiving "a juror's affidavit or evidence of a juror's statement on these matters." *Id.* The Rule does allow a juror to testify "about whether an outside influence was improperly brought to bear on any juror" or "to rebut a claim that the juror was not qualified to serve." *Id.* The second exception is not relevant to this case.

Outside influence in this context refers to "something originating from a source outside of the jury room and other than from the jurors themselves." *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012). Accordingly, "a Rule 606(b) inquiry is limited to that which occurs both outside of the jury room and outside of the jurors' personal knowledge and experience." *Coyler v. State*, 428 S.W.3d 117, 125 (Tex. Crim. App. 2014). For example, the Court of Criminal Appeals has explained that outside influence includes a juror's "internet research" regarding "the effects of date rape drugs" that the juror performed "at her home during

24

an overnight break" when the juror relayed that information to the other jurors. *McQuarrie*, 380 S.W.3d at 148, 154. Other examples identified by the Court of Criminal Appeals include "threats, bribes, communications with court personnel, . . . assaults upon a jury member," and "factual or legal information conveyed to the jurors by a bailiff or some other unauthorized person, who intends to affect the deliberations." *Coyler*, 428 S.W.3d at 125. "But the outside influence exception does not include influences such as coercion by a fellow juror or the discussion of a juror's own personal knowledge." *Id.* "[A] juror may not testify as to any matter or statement occurring during the jury's deliberations, the effect the matter had on any juror's mind or mental process, or how the matter influenced the juror's decision-making." *Ryser v. State*, 453 S.W.3d 17, 40 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).[4]

---

[4] In his reply brief, Jones argues that Rule 606(b) does not apply to this case because the State failed to object to the affidavit on that ground after he filed his motion for new trial. *See* Tex. R. App. P. 21.5 (authorizing State to oppose in writing assertions contained in defendant's motion for new trial). As support for this proposition, Jones refers to several opinions in which the reviewing courts noted that the State filed motions or made objections challenging the propriety of juror affidavits. *See Matthews v. State*, No. 03-13-00037-CR, 2014 WL 7466653, at *1 (Tex. App.—Austin Dec. 23, 2014, pet. ref'd) (mem. op., not designated for publication); *Adair v. State*, No. 03-11-00318-CR, 2013 WL 6665033, at *5 (Tex. App.—Austin Dec. 12, 2013, no pet.) (mem. op., not designated for publication); *Hart v. State*, 15 S.W.3d 117, 122 (Tex. App.—Texarkana 2000, pet. ref'd). However, those cases are distinguishable from the current case because the trial courts in each of those cases held a hearing on the motion for new trial, and nothing in the analyses from those cases suggests that the failure to make a written objection under Rule 606(b) in response to a defendant's motion for new trial when no hearing is held somehow renders the Rule inapplicable.

Alternatively, Jones asserts in his reply brief that the application of Rule 606(b) to this case unconstitutionally deprived him of the right to due process and a fair trial at sentencing because Rule 606(b) only applies to circumstances in which information is improperly given to jurors during their deliberations and not during the trial. When addressing constitutional challenges to Rule 606(b), multiple courts of appeals have concluded that the Rule is constitutional. *See Glover v. State*, 110 S.W.3d 549, 552 (Tex. App.—Waco 2003, pet. ref'd) (concluding that Rule 606(b) did not violate defendant's "constitutional rights to due process"); *Richardson v. State*, 83 S.W.3d 332, 362 (Tex. App.—Corpus Christi 2002, pet. ref'd) (determining that Rule 606(b) did not violate defendant's right to fair and impartial jury);

25

Regarding the outside-influence exception, nothing in the record indicates that Jones engaged in his behavior at trial to affect the jury's verdict. *See* Tex. R. Evid. 606(b) (explaining that juror may testify about outside influence "improperly brought to bear on any juror"); *Coyler*, 428 S.W.3d at 125 (explaining that outside influence applies to information given to jury by someone intending to affect outcome of case). Moreover, the portion of the affidavit mentioning the jury's discussion of Jones's behavior at trial specified that the discussion in the jury room was based on the jurors' personal knowledge gained from observing Jones at trial and not on independent research conducted by any of the jurors. *See McQuarrie*, 380 S.W.3d at 154; *see also Good v. State*, 723 S.W.2d 734, 736 n.3 (Tex. Crim. App. 1986) (noting "that the jury may nonetheless have observed appellant's general courtroom behavior and drawn some conclusions from that behavior"); *Garza v. State*, 82 S.W.3d 791, 794 (Tex. App.—Corpus Christi 2002, no pet.) (noting that juror's comment about how defendant's use of his left hand during trial was consistent with testimony from witnesses at trial was not outside influence); *In re S.P.*, 9 S.W.3d 304, 307 (Tex. App.—San Antonio 1999, no pet.) (deciding that "jury's discussion concerning the thickness of the probation file and speculation that [appellant] had been in trouble before" based on file "did not constitute an outside influence" because discussions occurred during deliberation and were based on jurors' "personal opinions").

---

*Sanders v. State*, 1 S.W.3d 885, 888 (Tex. App.—Austin 1999, no pet.) (rejecting argument that Rule 606(b) violated right to fair and impartial jury). Moreover, courts have regularly applied Rule 606(b) to circumstances in which jurors learned information before deliberating and then discussed that information while deliberating. *See, e.g.*, *Mata v. State*, 517 S.W.3d 257, 268-69 (Tex. App.—Corpus Christi 2017, pet. ref'd) (determining that discussion about juror's prior work experience as guard was not outside influence); *Garza v. State*, 82 S.W.3d 791, 794 (Tex. App.—Corpus Christi 2002, no pet.) (concluding that juror's comment was not outside influence where juror mentioned that defendant used his left hand during trial in manner that was consistent with witnesses' testimony).

In light of the preceding, Rule 606 would have prohibited the trial court from receiving the juror's affidavit or allowing the juror to testify regarding the effect that witnessing Jones's behavior at trial had on the juror's mental processes concerning the verdict or regarding any discussion the jurors may have had regarding his behavior. *See* Tex. R. Evid. 606(b). Accordingly, the trial court would not have abused its discretion by concluding that Jones failed to establish the existence of reasonable grounds showing that he could be entitled to relief and by failing to hold a hearing on the second ground in his motion for new trial.

For these reasons, we overrule Jones's third issue on appeal.

**Jury Deliberations**

In his second issue on appeal, Jones contends that the jury improperly "considered a fact not in evidence in its deliberations, which deprived [him] of a fair hearing." Specifically, Jones again argues that the jury observed him smile at Officer Rios when she testified about how he would masturbate in front of female employees at the jail. Further, Jones contends that "[t]his non-testimonial non-verbal behavior bypassed the constitutional protections . . . of evidence coming solely from the witness stand[] and bypassed . . . his rights to confrontation, and of counsel." Moreover, Jones highlights the juror's affidavit as proof that the jurors improperly considered and discussed whether he looked at and smiled at Officer Rios. In addition, Jones asserts that by considering his behavior, the jury disregarded the instruction in the charge providing "that it is only from the witness stand that the jury is permitted to receive evidence regarding the case" and that the jury's misconduct entitles him to a new trial. *See* Tex. R. App. P. 21.3(g) (stating that defendant must be granted new trial or new punishment hearing when jury has engaged in misconduct depriving him of fair and impartial trial).

27

When presenting this issue on appeal, Jones acknowledges that his trial attorney took no actions to draw the smiling to the trial court's attention or request that any corrective action be taken. However, Jones asserts that this omission should not preclude him from presenting this claim on appeal because his trial counsel was unaware of his behavior. As support for this proposition, Jones refers to an affidavit prepared by his appellate counsel and admitted during the hearing on his motion to recuse the trial court judge in this case. In the affidavit, Jones's appellate counsel asserts that he asked the trial judge if Jones's trial counsel observed his smiling and that the trial judge explained that his trial counsel did not see the incident. Accordingly, Jones contends that this issue can be addressed on appeal. *See Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004) (explaining that "[i]f an objectionable event occurs before a party could reasonably have foreseen it, the omission of objection will not prevent appellate review").

Even if this claim can properly be addressed on appeal, we would be unable to sustain it. First, we note that none of the cases that Jones refers to as support for his claim that he was denied a fair trial involved a circumstance in which a jury considered this type of conduct displayed by a defendant during trial and that none of the cases suggest that a jury observing this type of conduct somehow violates a defendant's confrontation rights or his right to counsel. *See, e.g.*, *Holbrook v. Flynn*, 475 U.S. 560, 562, 572 (1986) (determining that presence of uniformed officers supplementing normal security detail did not deny defendant right to fair trial); *Irvin v. Dowd*, 366 U.S. 717, 722, 725, 727 (1961) (considering whether defendant was denied fair trial where there was extensive media coverage of case and where there was pattern of deep prejudice against defendant in community); *Pyles v. Johnson*, 136 F.3d 986, 990 (5th Cir. 1998) (addressing issue of whether juror engaged in juror misconduct by making "an unauthorized

visit to the crime scene"); *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (considering whether trial court erred by failing to grant mistrial after victim's relative shouted, "You did this for 200 dollars?"); *Alfaro v. State*, 224 S.W.3d 426, 430-33 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (deciding issue of whether trial court improperly denied motion for mistrial after complainant's husband attacked defendant during trial); *Howard v. State*, 941 S.W.2d 102, 117-18 (Tex. Crim. App. 1997) (considering whether trial court's decision to allow twenty uniformed officers to attend punishment phase violated his right to fair trial), *overruled on other grounds*, *Easley v. State*, 424 S.W.3d 535, 538 & n.23 (Tex. Crim. App. 2014); *Williams v. State*, 651 S.W.2d 820, 821-22 (Tex. App.—Houston [1st Dist.] 1983, pet. ref'd) (addressing issue asserting that jury was prejudiced against defendant and that he was deprived of due process where jury observed outburst at trial in which his family got into fight with police and in which he joined).

Moreover, when determining whether a spectator's conduct or expression impeding normal trial proceedings amounted to reversible error, appellate courts consider whether the defendant has established a reasonable probability that the expression interfered with the jury's verdicts. *See Howard*, 941 S.W.2d at 117. Assuming that a defendant's own conduct should be subject to appellate review, it seems logical to conclude that the defendant would, at a minimum, have the same burden to obtain relief on appeal. To meet this burden, the defendant must show that the external jury influence produced either actual or inherent prejudice. *See id.* Actual prejudice occurs when jurors articulated a consciousness of some prejudicial effect, and inherent prejudice occurs when "an unacceptable risk is presented of impermissible factors coming into play." *Id.* (quoting *Holbrock*, 475 U.S. at 570). Inherent prejudice is rare and "is reserved for extreme situations." *Id.* (quoting *Bundy v. Dugger*, 850 F.2d 1402, 1424 (11th Cir. 1988)).

29

Nothing in the record from the trial proceedings establishes that Jones's behavior caused any disruption to the trial. Similarly, although the juror explained in her affidavit that she observed Jones's behavior during trial, the juror also related that Jones's behavior had no bearing on her sentencing determination. Accordingly, Jones has failed to establish actual prejudice. *Cf. Alfaro*, 224 S.W.3d at 430-31 (concluding that no actual prejudice was shown when defendant did not provide juror affidavit or testimony from juror establishing that outburst had prejudicial effect on jurors' consciousness).

Additionally, we found no case law that a defendant smiling during the testimony of a witness qualifies as an extreme situation that would cause inherent prejudice. *See Howard*, 941 S.W.2d at 117-18 (determining that there was no inherent prejudice from presence of twenty uniformed police officers during punishment phase of defendant accused of murdering police officer); *Parker v. State*, 462 S.W.3d 559, 568-69 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (concluding that there was no inherent prejudice from "sixty to seventy spectators wearing purple"); *Davis v. State*, 223 S.W.3d 466, 475 (Tex. App.—Amarillo 2006, pet. dism'd) (deciding that record did not support conclusion that inherent prejudice occurred from spectators wearing medallions with victim's image); *see also Ayala v. State*, No. 12-10-00014-CR, 2010 WL 2680079, at *2 (Tex. App.—Tyler July 7, 2010, no pet.) (mem. op., not designated for publication) (determining that defendant "has not shown by reasonable probability that the 'extravagant expression of grief' of the victim's mother is one of those rare and extreme situations" that interfered with jury's verdict). "Moreover, the record shows that the prosecution did not improperly capitalize on" his smiling or even mention it during its closing arguments. *See Alfaro*, 224 S.W.3d at 433. Accordingly, we conclude that Jones has failed to show that his smiling created an unacceptable risk of impermissible factors coming into play.

30

Besides arguing that the jury improperly considered and discussed his smiling, Jones asserts in this issue that the trial court observed him smiling but took no corrective action such as removing the jury from the courtroom or instructing them to disregard his conduct. As support for the proposition that the trial court observed the smiling, Jones refers to the affidavit prepared by his appellate counsel and admitted during the hearing on his motion to recuse. In the affidavit, Jones's appellate counsel asserted that he asked the trial judge if she observed Jones smiling and that the trial judge explained that she did see him smiling. When presenting this issue, Jones analogizes this case to other cases in which trial courts did provide instructions to disregard due to conduct occurring in the courtroom. *See Gamboa*, 296 S.W.3d at 580 (determining that trial court did not abuse its discretion by denying motion for mistrial after outburst by family member of victim where trial court instructed jury to disregard event); *Dempsey v. State*, No. 05-06-01090-CR, 2008 WL 2971778, at *2-3 (Tex. App.—Dallas Aug. 5, 2008, pet. dism'd) (op., not designated for publication) (same); *Williams*, 651 S.W.2d at 821 (noting that trial court gave instruction to disregard fight between members of defendant's family and police that defendant ultimately joined).

However, we have been unable to locate any governing law requiring a trial court to sua sponte provide an instruction to disregard a defendant's smiling. *See George v. State*, 446 S.W.3d 490, 503 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (determining that trial court did not err by failing to provide instruction to jury to disregard defendant's absence when defendant was removed due to his own behavior); *see also Beasley v. State*, 634 S.W.2d 320, 321 (Tex. Crim. App. 1982) (explaining that "[a] defendant may not create reversible error by his own manipulation"); *Franks v. State*, 961 S.W.2d 253, 255 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (noting that defendant should not have ability to cause mistrial by initiating

31

conversation with jurors and then arguing that jurors received evidence from "unauthorized source"). Accordingly, we cannot conclude that the trial court erred by failing to instruct the jury to disregard Jones's behavior or take some other type of corrective action.

For these reasons, we overrule Jones's second issue on appeal.

## Ineffective Assistance of Counsel

In his final issue on appeal, Jones contends that his trial attorney provided ineffective assistance because his attorney did not "draw attention to mitigation evidence and evidence of remorsefulness" during closing arguments at the punishment hearing. Moreover, Jones argues that the issue of whether he expressed remorse was an important factor for the jury to consider and refers to the testimony of multiple witnesses and to portions of his medical records as support for his assertion that his remorse was an issue before the jury. Although Jones acknowledges that his trial attorney's closing argument "called for the jury to look past the mental illness, the drug use, [and] the violence" and "to see the human being within," he contends that the failure to mention the admitted evidence of remorse and mitigation is "inexplicable" and that "[n]o competent attorney would have failed to marshal the facts already in evidence . . . to support a plea for leniency." Additionally, Jones urges that there is a reasonable probability that he would not have been given a life sentence if his trial attorney had "pointed out in argument to the jury the examples of remorse[] and mitigation."

To demonstrate ineffective assistance of counsel, a defendant must establish by a preponderance of the evidence both deficient performance by counsel and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). First, the defendant must show that his counsel's performance fell below an

objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687-88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017). Next, the defendant must show the existence of a reasonable probability that the result of the proceeding would have been different absent his counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Burch*, 541 S.W.3d at 820; *Nava v. State*, 415 S.W.3d 289, 308 (Tex. Crim. App. 2013). "It will not suffice for [the defendant] to show 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 693). For ineffectiveness claims regarding counsel's performance during the punishment phase, the defendant must "prove that there is a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict." *Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012) (quoting *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005)). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *see Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

Appellate courts reviewing an ineffectiveness claim are highly deferential to trial counsel and "indulge in a strong presumption that counsel's conduct was *not* deficient." *See Nava*, 415 S.W.3d at 307-08; *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (stating that "counsel's conduct is reviewed with great deference, without the distorting effects of hindsight"). To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App.

2012); *Goodspeed*, 187 S.W.3d at 392. Evaluations of effectiveness are based on "the totality of the representation." *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013).

In general, direct appeals do not provide a useful vehicle for presenting ineffectiveness claims because the record for that type of claim "is generally undeveloped." *Goodspeed*, 187 S.W.3d at 392; *see Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). In addition, before their representation is deemed ineffective, trial attorneys should be afforded the opportunity to explain their actions. *Goodspeed*, 187 S.W.3d at 392. If a trial attorney has not been afforded that opportunity, a reviewing court should not find him to be deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308 (quoting *Menefield*, 363 S.W.3d at 593).

We note that Jones did not present an ineffectiveness claim in his motion for new trial and that no hearing addressed any ineffectiveness claim. Accordingly, the record is silent regarding trial counsel's reasons for not referring to the evidence that Jones highlights in his brief. Because the record is silent as to his trial counsel's reasoning, Jones "has failed to rebut the presumption this was a reasonable decision." *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). We do not believe that "this failure to act amounted to an error sufficiently egregious to satisfy the first prong of *Strickland* as a matter of law." *See id.*

As Jones concedes in his briefing, his trial counsel did present mitigation evidence and evidence of his remorse during the punishment phase. At the end of the punishment phase, trial counsel elected to make a short closing argument in which he stated that Jones would be punished for murdering Ruiz but emphasized that Jones has a family that loves him, that his mother did not provide a stable environment when he was growing up, that he did not have a role model to teach him how to be an adult, and that the lack of a stable family life

34

provided him with no foundation to deal with his problems. Additionally, trial counsel stated that Jones's learning disabilities and mental illness compounded his problems arising from the absence of a stable family life. Finally, trial counsel asked the jury to extend mercy to Jones.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). Questions regarding "which issues to sharpen and how best to clarify them" during closing argument have "many reasonable answers." *Id.* at 6. "Focusing on a small number of key points may be more persuasive than a shotgun approach." *Id.* at 7. "Indeed, it might sometimes make sense to forgo closing argument altogether." *Id.* at 6. "Judicial review of a defense attorney's summation is therefore highly deferential." *Id.*; *see also id.* at 8 (explaining that "judicious selection of arguments for summation is a core exercise of defense counsel's discretion"). "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect," and "[t]hat presumption has particular force where a [defendant] bases his ineffective-assistance claim solely on the trial record." *See id.* at 8.

Given the evidence of Jones's guilt, the nature of the crime, and the evidence submitted during the punishment phase regarding his future dangerousness, Jones's trial attorney could have reasonably concluded that the best strategy to employ was to provide a short closing argument in which he acknowledged the seriousness of the offense but asked for the jury to be merciful given Jones's traumatic childhood and mental illness. *See Flemming v. State*, 949 S.W.2d 876, 881 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (explaining that trial attorney could have reasonably concluded that best strategy was to provide brief closing

35

argument in which attorney was "open and honest to the jury"); *see also Devier v. Zant*, 3 F.3d 1445, 1454 (3d Cir. 1993) (addressing issue that trial attorney was deficient for not mentioning mitigating evidence in closing argument during punishment phase, observing that decision to place emphasis "on eliciting sympathy from the jury . . . rather than thoroughly dissecting the evidence presented . . . is a uniquely tactical decision that a reviewing court must treat with deference," and concluding that record did not support conclusion that trial counsel's argument was deficient); *Castillo v. State*, No. 13-10-00317-CR, 2011 WL 3853939, at *10-11 (Tex. App.—Corpus Christi Aug. 31, 2011, no pet.) (mem. op., not designated for publication) (considering issue asserting that trial counsel's closing argument during punishment phase was inadequate because it was only two pages long and because trial attorney did not summarize testimony of defense witnesses and determining that trial counsel could have reasonably believed that "the best strategy might be brevity and openness in an attempt to mitigate punishment"); *Jagaroo v. State*, 180 S.W.3d 793, 800 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (rejecting claim that trial counsel was ineffective where counsel sympathized with victims during closing argument).[5]

---

[5] On appeal, Jones refers to the following two cases when asserting that trial counsel's performance was deficient. *See Hall v. Washington*, 106 F.3d 742, 750 (7th Cir. 1997); *Moore v. State*, 983 S.W.2d 15, 23 (Tex. App.—Houston [14th Dist.] 1998, no pet.). However, we find those cases distinguishable. In *Moore*, the defendant argued that his trial attorney was ineffective for failing to present any mitigation evidence and by presenting a brief closing argument that encouraged the jury to return the maximum punishment. 983 S.W.2d at 22. Moreover, unlike this case, the ineffectiveness claim was presented during a hearing on a motion for new trial, and the defendant's trial attorney conceded that he failed to conduct any investigation regarding the defendant and, therefore, discovered no mitigating evidence and that the failure to do so "was not trial strategy." *Id.* In *Hall*, unlike this case, the ineffectiveness claim was presented in a post-conviction habeas proceeding. 106 F.3d at 744. Moreover, Hall's trial attorneys did not conduct any investigation regarding mitigating evidence despite the existence of multiple witnesses who would have testified for Hall at his punishment hearing. *Id.* at 746. During closing argument, in contrast to this case, Hall's attorney did not focus on the

Under these circumstances and given our standard of review, we cannot conclude that Jones's trial attorney's decision not to mention mitigation evidence or the evidence indicating that Jones felt remorse for his actions was not motivated by sound trial strategy or was so outrageous that no competent attorney would have behaved similarly. Accordingly, we conclude that Jones has failed to establish that his trial attorney provided ineffective assistance on this basis. *See Strickland*, 466 U.S. at 687-88.

In his reply brief, Jones asserts for the first time on appeal that his trial attorney provided ineffective assistance by failing to object to the erroneous instruction discussed in his first issue. Accordingly, Jones has presented a new argument in a reply brief, but reply briefs are "not intended to allow an appellant to raise new issues" that were not addressed in an appellee's brief. *State v. Sanchez*, 135 S.W.3d 698, 700 (Tex. App.—Dallas 2003) (explaining that court "need not consider the matter as it is a new issue raised in the State's reply brief"), *aff'd*, 138 S.W.3d 324 (Tex. Crim. App. 2004); *Barrios v. State*, 27 S.W.3d 313, 321-22 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (commenting that appellants may not present new issue for first time in reply brief); *see also Garrett v. State*, 220 S.W.3d 926, 928 (Tex. Crim. App. 2007) (explaining that Rules of Appellate Procedure require "that an appellant designate all issues for review in the original brief"). However, appellate courts have discretion "to consider new issues raised in a supplemental or amended brief." *Lewis v. State*, 402 S.W.3d 852, 856 n.2 (Tex. App.—Amarillo 2013), *aff'd*, 428 S.W.3d 860 (Tex. Crim. App. 2014).

Even if we were inclined to exercise our discretion to consider this issue, we would be unable to sustain this issue because the record in this case is silent as to Jones's

---

defendant or the offense and did not address Hall's particular history; instead, the attorney "relied upon sweeping and largely irrelevant appeals to the judge's personal beliefs and religious principles." *Id.* at 750.

trial attorney's reasons for failing to object to the jury charge and, therefore, because Jones "cannot make the requisite showing under the first prong of *Strickland*." *See Webber v. State*, 29 S.W.3d 226, 237-38 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *see also Sosa v. State*, No. 13-12-00764-CR, 2015 WL 7352310, at \*11 (Tex. App.—Corpus Christi Nov. 19, 2015 no pet.) (mem. op., not designated for publication) (concluding that "[b]ecause the record is silent concerning the reasons for counsel's failure to object to the parole instruction, we cannot conclude that counsel's challenged conduct was so outrageous that no competent attorney would have engaged in it"). Given that the four-year parole example did not apply to the offense at issue, Jones's trial counsel might reasonably have decided not to object to prevent the jury from considering that example when assessing his punishment. *See Sanchez v. State*, 243 S.W.3d 57, 69 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (noting that trial counsel may have had strategic reasons for failing to object to omission of instruction regarding good-conduct time). Regarding the inclusion of the single reference to good-conduct time, we have been unable to find any authority standing for the proposition that the failure to object to the inclusion of language in a jury charge that had been statutorily required to be included for years and that had been altered just two months before the trial in question is conduct that is so outrageous that no competent attorney would have acted similarly. *See Nava*, 415 S.W.3d at 308.

For these reasons, we overrule Jones's final issue on appeal.

## CONCLUSION

Having overruled all of Jones's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Goodwin and Baker

Affirmed

Filed:   September 2, 2021

Do Not Publish